*In re* MARRIAGE OF FRYDA SHEHADE, Petitioner-Appellee, and MESBAH SHEHADE, Respondent (Sabhi Chehade, Respondent-Appellant).

First District (4th Division)   No. 84—1902

Opinion filed October 24, 1985.

JIGANTI, P.J., dissenting.

DiMonte & Lizak, of Chicago (Albert Koretzky, of counsel), for appellant.

Collins & Uscian, of Chicago (George B. Collins and Christopher Bargione, of counsel), for appellee.

JUSTICE LINN delivered the opinion of the court:

Fryda Shehade (Fryda) filed a petition in the Cook County circuit court for dissolution of her marriage to Mesbah Shehade (Mesbah), distribution of their marital estate, and custody of their child. During the pendency of the proceeding the trial court entered an order which enjoined Mesbah from transferring, encumbering, or otherwise disposing of any of the property which belonged either to Fryda individually or to Fryda and Mesbah jointly.

Thereafter Mesbah assigned to his brother, Sabhi Chehade (Sabhi), Mesbah's interest in an agreement for the purchase of certain property located in Chicago and held in a land trust. Mesbah had entered into the agreement for the purchase of the property during the pendency of the dissolution proceeding.

Roughly seven months after the assignment, the trial court entered an order which enjoined Mesbah from conveying, transferring, assigning, or otherwise dealing with the property until further order of court. The order was entered pursuant to Fryda's motion therefor. Apparently, neither Fryda nor the trial court was aware of Mesbah's assignment of the property to his brother at the time the order was entered.

After Fryda learned of the assignment, she filed with the trial court a petition for rule to show cause, to add additional parties, and for other relief. In the pleading, Fryda contended that Mesbah's assignment of his interest in the Chicago property to Sabhi constituted a fraud upon her right to and in the property, and that the assignment was colorable, illusory, and a sham. As ultimately amended, Fryda's petition requested that the assignment be declared null and void, that Sabhi be made an additional party defendant, and that he be directed to reimburse her for all rents collected from the property since the trial court's order which enjoined Mesbah from assigning his interest in the property.

Sabhi answered Fryda's petition and denied that the transaction had been colorable, illusory, or a sham or fraud upon Fryda's interest. Following a hearing at which Fryda, Sabhi, and Sabri Shehade (a nephew of Mesbah and his brother Sabhi) testified, the trial court found that the transaction was a sham designed to deprive Fryda of her interest to and in the premises. The court held the assignment null and void and ordered Sabhi to account to Fryda for rents he had collected on the premises. The trial court later denied Sabhi's motion to reconsider its order. Sabhi appeals.

The parties raise the following questions for our review:

1. Whether the trial court's determination that Mesbah's assign-

ment of his interest in the property to Sabhi was a sham, illusory, and colorable, was against the manifest weight of the evidence;

2. Whether the trial court acted beyond the scope of its authority under the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1983, ch. 40, par. 101 *et seq.*) where it held the assignment null and void and ordered Sabhi to account to Fryda for rents collected upon the premises.

We affirm.

BACKGROUND

The record reflects the following pertinent pleading and testamentary evidence.

According to Fryda's petition for dissolution of marriage and other relief which was filed on October 13, 1982, Fryda and Mesbah were married on March 5, 1974; one child, age seven, was born of the marriage. Fryda claimed that during the course of the marriage, Mesbah acquired various assets which were marital assets, "notwithstanding their standing in the name of [Mesbah], any alias of [Mesbah], or any nominee on his behalf."

Mesbah's answer to the petition denied in material substance the allegations of the petition, and requested that the same be dismissed.

Roughly four months after her petition for dissolution was filed, Fryda presented to the court her emergency petition for injunctive and other relief. In it she alleged in substance that Mesbah had caused her physical abuse; had attacked her automobile and caused it damage to the extent that it was inoperable; and that Mesbah had "bragged" to Fryda "that he was in the process of selling certain parcels of real estate acquired during the marriage, and that there would be nothing left for [Fryda] to obtain her share of in this case." Fryda further alleged that she therefore feared that Mesbah would waste, sell, convey, transfer, assign, hide, conceal, destroy, encumber or otherwise dissipate the marital estate of the parties unless he were restrained and enjoined from doing so during the pendency of the cause.

Based upon these allegations, as well as the arguments of both parties at a hearing upon the petition held on the day it was filed at which both Fryda and Mesbah were present, the trial court entered an order dated February 10, 1983, which granted Fryda's petition. The trial court's order stated *inter alia* that "each of the parties is restrained and enjoined from wasting, selling, conveying, hiding, transferring, concealing, damaging, destroying, encumbering or otherwise dealing with assets held in his or her name or alias, or in the name of another for the benefit of either party, pending further Order

of Court."

Roughly a month and a half later, on March 31, and pursuant to Fryda's petition for a rule to show cause and other relief, the trial court entered an order which directed, *inter alia*, that a domestic violence order be issued against Mesbah *instanter*. The agreed order of protest, filed the same day, provided in relevant part that Mesbah was "restrained from transferring, encumbering, concealing, damaging or otherwise disposing of any of [Fryda's] property or joint property of [Fryda and Mesbah]." The order stated an expiration date and time of March 31, 1984, at 4 p.m.

Thereafter, between April and September, 1983, the parties litigated matters pertaining to temporary custody of the minor child, temporary maintenance and child support, and attorney's fees. Temporary custody was awarded to Fryda in mid-July. In early September, Fryda filed an emergency petition for rule to show cause and other relief in which she alleged that Mesbah had exercised visitation with the parties' child on August 27, but had failed to return the child to Fryda's custody. She claimed that she had been informed and believed that Mesbah had removed the child from the State of Illinois and the United States.

A rule was entered against Mesbah on the same day, made returnable on September 19, 1983. Mesbah failed to appear on the appointed day. His attorney of record motioned the court to withdraw as Mesbah's counsel; the affidavit in support of the motion stated in pertinent part that the attorney believed, "[u]pon information and belief, [that] [Mesbah] is not any longer living in the United States of America." An attachment order upon Mesbah was issued on September 19. His attorney of record was also granted leave to withdraw on that date.

A month later, on November 16, Fryda petitioned the court to grant her leave to file her petition to add the Devon Bank as an additional party defendant, and to issue temporary restraining orders, without notice and without bond for good cause shown, restraining the bank and Mesbah from effecting the assignment, conveyance, sale or transfer of numerous specified bank accounts and of the interest in a certain land trust held by the bank. The trial court granted the motion and entered the temporary restraining orders as requested. Fryda was also granted leave to file her petition to add Devon Bank as an additional party respondent.

A week later the trial court granted Fryda's motion to add Devon Bank. The trial court further converted its temporary restraining orders of November 16 into preliminary injunctions, issued without no-

tice and without bond, pending further court order.

Two months later, on January 30, 1984, Fryda filed a petition for rule to show cause, to add an additional party, and for other relief. In it she alleged in pertinent substance that on April 20, 1983, Mesbah assigned his beneficial interest in the Devon land trust to his brother, Sabhi Chehade. A copy of the assignment was attached to the pleading. Fryda claimed that the assignment was in violation of the court's previous orders and constituted a fraud upon her right to and in said property, and was colorable, illusory, and a sham. Fryda further alleged that Sabhi knew of the court's orders which enjoined Mesbah from any assignment or other conveyance of such property. She requested, *inter alia*, that Sabhi be made an additional party respondent in the cause and that the April 20 assignment be set aside and declared null and void. The petition was later amended to request in addition that Sabhi be directed to reimburse Fryda for all rents collected at the premises since November 16, 1983.

Sabhi's answer to the petition, filed March 7, 1984, denied that the assignment was a sham and denied any knowledge of the court's injunction against Mesbah to restrain his assignment of his interest in the land trust.

The trial court held its hearing on the matter on May 8, 1984. Fryda testified on her own behalf; Sabhi and his nephew testified in opposition.

Fryda testified that she knew her brother-in-law Sabhi and knew that he had business dealings with her husband. She stated that one day in February 1983 she went to her husband's store to bring him lunch, which was customary for her to do. While there she heard Mesbah speaking to Sabhi in Arabic. Mesban told Sabhi that Fryda was suing Mesbah for divorce, that everything was "tied up," and that Mesbah said that he was "going to screw [Fryda] up" because he was "not going to give her anything, and that [he was] going to transfer everything to [his] brothers."

Fryda testified that she was able to understand two people speaking to each other in Arabic. She further stated that the conversation took place on or about February 10, 1983, the date upon which the trial court entered its order which enjoined Mesbah from selling any of his real estate.

According to Sabhi, he knew nothing of the February 10 order and nothing of the divorce proceeding. He stated that on February 10 he was in the Middle East and that he returned to the United States on or about February 25, 1983.

Sabhi stated that a few days after his return, he learned from a

friend that Mesbah was going to sell his interest in the premises at issue to the friend. Sabhi expressed to the friend his desire to purchase the building. The friend responded that Mesbah had told the friend that Mesbah would not sell the property to Sabhi.

Sabhi stated that he had not talked to his brother in 2½ years. He met with Mesbah at some point and offered to buy the building in installments. The value of the building was $80,000, and it was encumbered by a $50,000 mortgage. Sabhi agreed to assume the mortgage and to pay Mesbah $30,000 in installments, although they did not specify the amounts of these installments because, as brothers, they understood that Sabhi would pay Mesbah when he was able. Sabhi gave Mesbah a check for $2,750 on March 5, 1983, which was admitted into evidence. He stated that it was a deposit on his purchase of the interest in the agreement.

Later Mesbah refused to sign documents of assignment until Sabhi paid him more money. Sabhi offered to pay Mesbah with merchandise rather than money, and Mesbah agreed. A document admitted into evidence indicated a listing of several kinds of merchandise in various amounts, the values thereof, and a total value of $7,254.28. The document contains no names, dates, signatures, or references to the assignment or any other form of transaction.

The assignment, also admitted into evidence, was dated April 20, 1983. In it Mesbah assigned to Sabhi his interest in an articles of agreement for trustee's deed, dated November 23, 1982, wherein Devon Bank as trustee under trust agreement No. 3972 was seller and "Misbah Chihade [sic]" was the purchaser of property located at 2867 North Milwaukee Avenue in Chicago. Also admitted into evidence was the consent to and agreement of the sole beneficiary of the land trust to the assignment from Mesbah to Sabhi. This document was dated May 19, 1983.

Sabhi testified that he later made the following payments to Mesbah, as indicated. On June 6, 1983, he gave Mesbah a check for $6,000. He stated that Mesbah told him to put the check in the name of their nephew because Mesbah owed the nephew money. Sabhi placed the nephew's name on the check. In December 1983, Sabhi had a cashier's check made payable to Mesbah for $3,367.72. In January 1984, Sabhi had another cashier's check made payable to Sabri for $2,528.

In September, 1983, Mesbah asked Sabhi for more money, because, Mesbah said, he was going "on vacation." Sabhi gave Mesbah a check for $5,000 but told him to hold it until Sabhi had sufficient funds to cover the check. Sabhi testified that Mesbah gave the check

to their nephew, who attempted to cash the check but could not because there were insufficient funds in the account.

Two weeks later, Sabhi paid the nephew $2,000 by check. He paid the balance of $3,000 three weeks later, in cash.

In April 1984, Sabhi sent a cashier's check for $1,000 to Mesbah. In May he sent two more cashier's checks for $1,000 each to Mesbah. All of these were sent to Mesbah in Jerusalem.

The nephew of Mesbah and Sabhi testified that Mesbah had owed him $20,000, all of which had been repaid by the time of the hearing. He testified that payment was made with $7,000 worth of general merchandise, a check in the amount of $6,000, and the monies paid to him by Sabhi in lieu of the $5,000 check not covered by sufficient funds.

The nephew stated that he had brought the $20,000 from the Middle East when he came to the United States, apparently in approximately 1980. He stated that he kept the money in a safe rather than a bank. He testified that he loaned the money to Mesbah in 1981. He also stated that from 1980 to 1983 he worked for his uncle Yusef, earning roughly $300 per week. In July 1983 Sabhi opened his own business of selling clothing; apparently part of his inventory was comprised of merchandise given to him by Mesbah.

Based on the evidence and testimony of Fryda, Sabhi, and the nephew of Sabhi and Mesbah, as well as the arguments of counsel, the court entered its order on May 8 which granted Fryda's petition. The court's order provided that: (1) Sabhi and the Devon Bank were named as respondents in the cause; (2) a rule was entered against Mesbah *instanter*, who was found in contempt of court; (3) the assignment of April 20, 1983, from Mesbah to Sabhi was held to be null and void and of no legal effect whatsoever; and (4) Sabhi was to forthwith account to Fryda for all rents collected by him or for him by reason of his pretended ownership of said property.

Sabhi subsequently filed a motion to vacate this order, which the trial court denied. Sabhi's timely appeal followed.

OPINION

I

Sabhi argues first that the trial court's judgment should be reversed because there was no evidence that the assignment was made collusively with the intent that Mesbah would retain true title to and ownership of the property.

Generally, a spouse has an absolute right to dispose of his or

her property in any manner and without the concurrence of the other spouse. (*Johnson v. La Grange State Bank* (1978), 73 Ill. 2d 342, 357, 383 N.E.2d 185; *Payne v. River Forest State Bank & Trust Co.* (1980), 81 Ill. App. 3d 1128, 1130, 401 N.E.2d 1229.) Such disposition of property is permissible even where its sole purpose is to minimize or defeat the statutory marital interest the other spouse may have in the property conveyed. (*Hofmann v. Hofmann* (1983), 39 Ill. 2d 205, 219, 446 N.E.2d 499; *Lesnik v. Estate of Lesnik* (1980), 82 Ill. App. 3d 1102, 1105, 403 N.E.2d 683.) Nevertheless, where a conveyance from a spouse to a third party is essentially nothing more than a sham transaction, it is tantamount to a fraud and subject to defeasance by the other spouse. *Hofmann v. Hofmann* (1983), 94 Ill. 2d 205, 221, 446 N.E.2d 499; *In re Estate of Nemecek* (1980), 85 Ill. App. 3d 881, 883, 407 N.E.2d 655.

■ A sham transfer of property is one which is either "colorable" or "illusory," such that the transferor had no intent to convey any present interest in the property, but, in fact, intended to retain complete ownership. (*Johnson v. La Grange State Bank* (1978), 73 Ill. 2d 342, 359, 383 N.E.2d 185; *O'Neill v. De Laney* (1980), 92 Ill. App. 3d 292, 298-99, 415 N.E.2d 1260.) "[A]n illusory transfer is one which takes back all that it gives, while a colorable transfer is one which appears absolute on its face but due to some secret or tacit understanding between the transferor and the transferee the transfer is, in fact, not a transfer because the parties intended that ownership be retained by the transferor. [Citation.]" *Johnson v. La Grange State Bank* (1978), 73 Ill. 2d 342, 359, 383 N.E.2d 185.

■ In order to establish that a transfer of property amounted to a fraud subject to defeasance, the complaining spouse must prove such allegations by clear and convincing evidence. (*Hofmann v. Hofmann* (1983), 94 Ill. 2d 205, 222, 446 N.E.2d 499; *In re Marriage of Glessner* (1983), 119 Ill. App. 3d 306, 315, 456 N.E.2d 311.) The determination of whether the conveyance at issue was fraudulent depends upon all of the circumstances surrounding the transfer. *O'Neill v. De Laney* (1980), 92 Ill. App. 3d 292, 299, 415 N.E.2d 1260.

■ In the case at bar, the trial court found that Mesbah's assignment of his interest in the real estate purchase agreement to Sabhi was nothing more than a sham transaction designed to circumvent the court's prior order which restrained and enjoined Mesbah from conveying, transferring, selling, or assigning any of his property pending final disposition of the dissolution action. Based upon all of the surrounding circumstances and the testimony of the witnesses at the court's hearing, the trial court essentially concluded that Mesbah had

no intent to convey to Sabhi any present interest in the property, but instead planned to retain ownership in himself.

It is well settled that a trial court's determination in this regard will be set aside only if it is against the manifest weight of the evidence. (*Vee See Construction Co. v. Luckett* (1981), 102 Ill. App. 3d 444, 447, 430 N.E.2d 91.) It is also long established that a court of review will not disturb a judgment where it is based upon an assessment of the credibility of the witnesses. (*Economy Fire & Casualty Co. v. Warren* (1979), 71 Ill. App. 3d 625, 627, 390 N.E.2d 361.) Thus, "[t]he credibility of the witnesses and the weight to be accorded their testimony is a matter solely within the province of the trial court as trier of fact." *Ross v. Steiner* (1978), 66 Ill. App. 3d 567, 574, 384 N.E.2d 398.

In order to conclude here that the assignment from Mesbah to Sabhi was a sham, the trial court discredited the testimony of Sabhi and his nephew as to the natures of and bases for the various monetary transfers between Mesbah, Sabhi, and their nephew. Thus the trial court correctly subjected the transaction to closer scrutiny since the transfer was between family members. (*Hofmann v. Hofmann* (1983), 94 Ill. 2d 205, 222-23, 446 N.E.2d 499.) Such close scrutiny was particularly appropriate here, where the nephew, when questioned, "If you were asked to come and testify to something you will help him (the uncle), will you not," replied, "Of course. He is my family."

Without the testimony of Sabhi and his nephew, there was no clear proof that the payments from Sabhi to Mesbah were made in relation to Sabhi's purchase of Mesbah's interest in the property. In fact, in view of the admitted business dealing between them, the payments could have been made for any number of reasons wholly unrelated to the purported assignment.

In addition to this lack of proof as to the true nature of the payments between the brothers and their nephew, the record establishes other surrounding circumstances. First, Fryda testified that she heard Mesbah tell Sabhi that he intended to "give" everything to his brothers in order to deprive Fryda of any interest therein. In addition, Mesbah subsequently left the country with the parties' only child and travelled to Jerusalem in direct violation of the court's order that temporary custody be in Fryda. Moreover, Sabhi knew of this, admitted that he knew of this, and in fact admitted that he sent some of his payments to Mesbah in Jerusalem.

Based upon all of the evidence produced at trial and the circumstances surrounding the assignment, the trial court reasonably could

have found that the transfers of money between the brothers and the nephew were part and parcel of their collusive attempt to defraud Fryda of her interest and yet to smokescreen the intent that Mesbah retain true ownership of the property. Accordingly, we cannot conclude that the trial court's judgment was against the manifest weight of the evidence.

## II

Sabhi argues in addition that even if there had been evidence of a collusive transfer, the trial court could have awarded only a marital property lien against the transferee's title; consequently, the trial court erred in invalidating the assignment.

■ A trial court judge in the domestic relations division possesses the jurisdiction to hear all issues which are justiciable in nature and are related to the dissolution of marriage proceeding. (*In re Marriage of Pahlke* (1983), 120 Ill. App. 3d 1009, 1014, 458 N.E.2d 1141; *In re Marriage of Peshek* (1980), 89 Ill. App. 3d 959, 412 N.E.2d 698.) Thus a judge may declare a transfer void when it is demonstrated that the conveyance was colorable or illusory. *O'Neill v. De Laney* (1980), 92 Ill. App. 3d 292, 298, 415 N.E.2d 1260.

■ The trial court here had full authority to declare the assignment from Mesbah to Sabhi void and of no legal effect. We note that *Hofmann v. Hofmann* (1983), 94 Ill. 2d 205, 446 N.E.2d 499, upon which Sabhi relies, does not dictate a contrary result. *Hofmann* involved a fraudulent forfeiture of the property in dispute and is consequently distinguishable from the facts here.

■ Sabhi also contends that Fryda could not claim any marital interest in the assignment at issue because no evidence was presented as to the percentage of marital property interest to which Fryda would be entitled upon dissolution of the marriage. No showing to this effect was required, however, as Mesbah's interest was presumed to be marital property (Ill. Rev. Stat. 1983, ch. 40, par. 503(b)) in which both Mesbah and Fryda were presumed to have a species of common ownership which vested upon the commencement of the dissolution action and continued during its pendency (Ill. Rev. Stat. 1981, ch. 40, par. 503(c)) and which in any event was to be finally determined by the court at a later date. (See Ill. Rev. Stat. 1983, ch. 40, par. 501(d)(3); *In re Marriage of Pahlke* (1983), 120 Ill. App. 3d 1009, 1016, 458 N.E.2d 1141; *In re Marriage of Zymali* (1981), 94 Ill. App. 3d 1145, 1148, 419 N.E.2d 487.) Consequently we find no basis for reversal of the trial court's judgment.

Affirmed.

JOHNSON, J., concurs.

PRESIDING JUSTICE JIGANTI, dissenting:

A conveyance of real property can only be voided upon a showing of clear and convincing evidence that the transferor had no intent to convey any present interest in the property but, in fact, intended to retain complete ownership. (*Hofmann v. Hofmann* (1983), 94 Ill. 2d 205, 446 N.E.2d 499.) The setting aside of a conveyance is a harsh remedy in that it deprives one of the right of ownership of property, therefore, the burden is on the party attacking the conveyance to establish through clear and convincing evidence that the transfer was a sham.

Fryda's evidence at trial consisted of her testimony that she overheard Mesbah stating that he wanted to "transfer" everything to Sabhi and leave her nothing. In her emergency petition for injunctive relief, she alleged that Mesbah was in the process of "selling" certain parcels of real estate acquired during the marriage in an attempt to deprive her of any marital rights she may have in the property.

This evidence, at best, merely shows that Mesbah may have intended to defeat any possible marital interest Fryda may have had in the property conveyed. However, as the majority correctly points out, Mesbah had the right to dispose of his property without the concurrence of Fryda even if the transfer may have been for the sole purpose of minimizing or defeating her marital rights in the property.

While it is true that conveyances among family members are subject to stricter scrutiny than arms-length transactions, the familial relationship alone does not raise the presumption that the conveyance was fraudulent. Sabhi testified that he agreed to buy the property from Mesbah for $80,000. The terms of the sale were that Sabhi was to assume the $50,000 mortgage on the property and pay the $30,000 balance to Mesbah in installments. The agreement was evidenced by a general assignment, signed by Mesbah and notarized by Sabhi's attorney, which shows that Mesbah transferred his interest in the property to Sabhi. Also admitted was a consent to the assignment signed by the sole beneficiary of the land trust to the assignment from Mesbah to Sabhi. Sabhi and his nephew, Sabri, testified to a number of payments made by Sabhi to either Mesbah, or upon the direction of Mesbah, to Sabri over several months amounting to approximately $30,000. Several cancelled checks were admitted into evidence which substantiated Sabhi's testimony that he paid Mesbah nearly $30,000

for the property. While the majority may speculate as to the purpose of these payments, Fryda did not present any evidence that would contradict or "discredit" the testimony of Sabhi and his nephew.

The facts that Mesbah fled the country with the couple's only son in violation of a custody order and that Mesbah also violated a court order restraining him from selling or transferring property pending the divorce action are circumstances which do not establish clearly and convincingly that Mesbah intended to retain ownership. Rather, the majority's recitation of these facts, in effect, unfairly penalizes Sabhi for his brother's misconduct and has no relevance to the issue of whether the transfer of property was a sham. In conclusion, the evidence Fryda produced at trial did not clearly and convincingly establish that the transaction was colorable or illusory and that Mesbah intended to retain ownership of the property. Accordingly, I would reverse the judgment.